### JOSEPH M. COLEMAN & ASSOCIATES, LTD.

v.

### COLONIAL METALS.

Civ. No. JFM–95–837.

United States District Court, D. of Maryland.

June 8, 1995.

 

William B. Cowen, Washington, DC, for plaintiff.

Kenneth G. Rafter, Baltimore, MD, John B. Conservage, Kristen L. Drake, Buchanan Ingersoll, Professional Corp., Harrisburg, MD, for defendant.

### MEMORANDUM

MOTZ, Chief Judge.

Joseph M. Coleman & Associates, Ltd., ("Coleman") a Maryland corporation, has brought this action against Colonial Metals Co., ("Colonial") a Pennsylvania corporation, claiming that Colonial failed to pay a consulting fee allegedly due Coleman in connection with the successful negotiation of amendments to a truck leasing agreement between Colonial and a third party, Penske Trucking Leasing, L.P. Colonial has filed a motion to dismiss for lack of personal jurisdiction. Alternatively, Colonial requests that this action be transferred to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).

### I.

Coleman is in the business of consulting with companies such as Colonial concerning truck transportation issues, including negotiating and structuring truck leases between those companies and truck lessors. In December 1988, Colonial and Coleman's predecessor, Friedman, Fuller & Coleman, Inc. ("FF & C") (also a Maryland corporation), entered into a consulting agreement which provided, *inter alia*, that if FF & C was successful in negotiating reductions in Colonial's leasing contracts, Colonial would pay 50% of the savings obtained to FF & C. The agreement also provided that FF & C would provide auditing and other advisory services. FF & C initiated the contact with Colonial and travelled to Colonial's office in Pennsylvania to solicit the agreement. The agreement was executed by Colonial in Pennsylvania.

After succeeding to the interest of FF & C under the contract, Coleman continued to perform services for Colonial. In April 1993 the parties formally entered into a second agreement. Coleman alleges that Colonial

contacted it to negotiate the agreement. Colonial again executed the agreement in Pennsylvania.

Coleman alleges that Colonial would ordinarily call Coleman in Maryland and request specific services and that the vast bulk of those services were performed by Coleman at its offices in Bethesda, Maryland. According to Coleman, Colonial routinely shipped documents to Maryland to be analyzed by Coleman. Until it allegedly breached its agreement, Colonial sent payment for Coleman's services to the latter's office in Bethesda. All reports and correspondence generated by Coleman in connection with its services were prepared in Maryland. However, Coleman representatives have travelled to Pennsylvania to conduct audits and perform consulting services for Colonial. Colonial representatives have never travelled to Maryland in connection with any work that Coleman has done for it.

In the summer of 1993 Colonial called Coleman in Maryland, informed its principal, Joseph Coleman, that it had received a lease modification proposal from Penske, and asked Coleman to review and comment on it. After completing his review, Coleman advised Colonial that it could obtain a more favorable deal if it waited until the following year to negotiate the amendments with Penske. According to Coleman, it was understood that at the appropriate time, Coleman would negotiate the amendments for Colonial. In 1994 Coleman did negotiate amendments to Colonial's leasing agreement with Penske. According to Coleman, these amendments will result in a net savings to Colonial of $470,750.00 over the term of the agreement.

Penske is a Pennsylvania company, and the agreement between Penske and Colonial upon which Coleman bases its claim related to a fleet of trucks located in Pennsylvania. All meetings relating to the renegotiation of the lease agreement were held in Pennsylvania and the agreement was executed in Pennsylvania. Neither Colonial nor Penske travelled to Maryland to meet with Coleman with respect to the agreement until after the instant claim was asserted by Coleman. However, Coleman alleges that most of the negotiations that Coleman performed on behalf of Colonial were conducted by telephone and fax machines from Coleman's office in Maryland.

## II.

■ Coleman seeks to sustain personal jurisdiction over Colonial under Maryland's long arm statute. Md.Cts. & Jud.Proc. Art., § 6–103.[1] Specifically, Coleman contends that Colonial has "transacted business" in Maryland within the meaning of § 6–103(b)(1).

■ It is now well settled that in enacting the long arm statute the Maryland General Assembly intended to "expand the exercise of personal jurisdiction to the limits of the due process clause." *Camelback Ski Corp. v. Behning*, 307 Md. 270, 513 A.2d 874, 876 (1986), *vacated*, 480 U.S. 901, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987), *aff'd*, 312 Md. 330, 539 A.2d 1107, *cert. denied*, 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988); *Mohamed v. Michael*, 370 A.2d 551, 553 (Md.1977). It is frequently stated that it follows from this settled proposition that the dual inquiries of whether a defendant's activities bring him within the purview of the long arm statute and whether jurisdiction may constitutionally be asserted over him are "merged" into one.[2]

1.  Plaintiff also asserts that Colonial is subject to personal jurisdiction in Maryland under the doctrine of "general jurisdiction." However, the only facts that it relies upon to support that contention are that: (1) Colonial pays road use taxes in Maryland; (2) its trucks haul scrap metal in Maryland (for itself and a related company owned by its principals); (3) it purchases scrap metal in Maryland; and (4) a Maryland bank is one of its lenders and a secured party with respect to certain inventory and assets located in Pennsylvania. These facts are far from sufficient to establish "continuous and systematic general business contacts with" Maryland as is necessary to invoke the general jurisdiction doctrine. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984).

2.  Although this corollary rule has been repeated so often that it might be considered beyond dispute, I must confess discomfort with it. In my view it does not follow from the principle that the General Assembly intended to "expand the exercise of personal jurisdiction to the limits of the due process clause" that the language of the

*Ellicott Machine Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir.1993) ("Because the Maryland legislature designed its long-arm statute to extend personal jurisdiction to the limits allowed by federal due process, our normal two-step inquiry merges into one."); *Leather Masters (PVT), Ltd. v. Giampier Ltd.*, 836 F.Supp. 328, 330 (D.Md. 1993) (same).

The fundamental question to be answered in deciding the constitutional issue is whether it can be said that Colonial "purposefully avail[ed] itself of the privilege of conducting activities within" Maryland. *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). Distilled to their essence, the facts pertaining to that question are as follows:

1. Colonial did not solicit the initial consulting agreement with Coleman in Maryland. To the contrary, Coleman's predecessor solicited that agreement with Coleman in Pennsylvania.

2. According to Coleman, Colonial (from Pennsylvania) initially contacted Coleman (in Maryland) to negotiate the second consulting agreement which continued the relationship between the parties.

3. Colonial executed the consulting agreements with Coleman in Pennsylvania, and Coleman does not dispute that Pennsylvania law applies to the interpretation of the contract.

4. The consulting agreements between Coleman and Colonial related to trucking leases that Colonial had with third parties who are not Marylanders. The specific trucking lease giving rise to Coleman's claim for payment in this case was with a Pennsylvania company and related to a fleet of trucks located in Pennsylvania.

5. Although representatives of Coleman went to Colonial's principal office in Pennsylvania to perform audits and other consulting services, it did the majority of work under the consulting agreements at its office in Maryland.

6. Colonial directed correspondence and telephone calls from Pennsylvania to Maryland and sent payments due under the consulting agreements to Coleman in Maryland.

7. No representative of Colonial ever physically came into Maryland in connection

long arm statute should be ignored; rather, a more correct understanding of the first principle is that to the extent that a defendant's activities are covered by the statutory language, the reach of the statute extends to the outermost boundaries of the due process clause. In drawing this distinction I do not mean to be academic and hope that I am not being conceptually obscure. To my mind the distinction would make a practical difference in this case because I do not believe that a company such as Colonial which (1) simply entered into a contract with a Marylander to have consulting work performed in connection with renegotiating agreements centered in Pennsylvania, (2) never entered into Maryland in regard to that contract, and (3) merely directed correspondence and telephone calls into Maryland from Pennsylvania can reasonably be said to have "transacted business" in Maryland. Thus, I believe this case would more properly be resolved based on the language of Maryland's long arm statute rather than on constitutional grounds. If, on the other hand, the Maryland statute asserted jurisdiction (as did the Tennessee statute involved in *William W. Bond, Jr., & Assocs., Inc. v. Montego Bay Dev. Corp.*, 405 F.Supp. 256 (W.D.Tenn.1975)) over any defendant "entering into a contract for services to be rendered ... in this state," Colonial's activities would be covered by the statutory language

since it entered into the contract with Coleman knowing that Coleman would perform work in Maryland. In that event the corollary question of whether the statute could be constitutionally applied to Colonial would be distinct and clearly presented.

A recent opinion the Court of Special Appeals appears to share my concern about telescoping the statutory and constitutional inquiries. *See Talegen Corp. v. Signet Leasing & Fin. Corp.*, 104 Md.App. 663, 670, 657 A.2d 406, 410 (Ct. Spec.App.1995) ("Although we doubt that CFC's connections with Maryland should be considered 'transacting business' in Maryland, we are mindful that this issue is enveloped by the due process issue...."). Moreover, it is the federal courts that have tended to used the "merged into one" language. Although the Maryland Court of Appeals has focused primarily upon the due process clause in addressing long-arm jurisdiction issues, it has begun its analysis not by referring to a "merger" or "telescoping" of the statutory and constitutional inquiries into one, but by using the more general language that these are two "interrelated" inquiries. *See, e.g., Mohamed*, 370 A.2d at 553 ("this Court has consistently indicated that these two considerations are interrelated"); *Geelhoed v. Jensen*, 277 Md. 220, 352 A.2d 818, 821 (1976).

with work to be performed under the consulting agreement.

The cases cited by Coleman to support the assertion of jurisdiction over Colonial that are most directly on point are *Bond, supra, Sterling Indus. Corp. v. Telephone, Inc.*, 484 F.Supp. 1294 (W.D.Mich.1980), and *Controlled Metals, Inc. v. Non–Ferrous Int'l Corp.*, 410 F.Supp. 339 (E.D.Pa.1976). In *Bond* the court, applying the Tennessee long arm statute, upheld the assertion of jurisdiction over defendants (coincidentally Marylanders) who had entered into a contract under which the plaintiff was to perform architectural services for them. Although the project to which the contract related was to be constructed in Maryland, defendants knew that plaintiff would do most of its work under the contract in Tennessee. In *Sterling* and *Controlled Metals*, the assertion of personal jurisdiction under the Pennsylvania long arm statute was upheld against out-of-state defendant corporations who had ordered manufactured goods from Pennsylvania companies.

*Bond, Sterling* and *Controlled Metals* can all be distinguished from the instant case. In *Bond*, for example, the defendant had initiated the relationship between the parties and their contract provided that Tennessee law would apply to its interpretation. Both in *Sterling* and *Controlled Metals* the defendant had initiated the orders. Further, in *Controlled Metals*, the court found that Pennsylvania law would apply to the parties' agreement, and in *Sterling* the court drew comfort from (though it did not rely upon) the fact that representatives of the defendant had physically come into Pennsylvania to visit plaintiff's facilities.

Here, although Coleman alleges that Colonial contacted it to negotiate the second consulting agreement, Coleman's predecessor had initially solicited the relationship between the parties on a visit to Pennsylvania. Moreover, Pennsylvania law apparently applies to the consulting agreement in question, and no representative of Colonial ever came into Maryland (prior to the this dispute arising) in connection with the agreement. On these facts there are authorities that suggest that the assertion of *in personam* jurisdiction over Colonial in Maryland would be unconstitutional. *See, e.g., Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir.1983), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2180, 80 L.Ed.2d 561 (1984); *Jadair, Inc. v. Walt Keeler Co., Inc.*, 679 F.2d 131 (7th Cir.), *cert. denied*, 459 U.S. 944, 103 S.Ct. 258, 74 L.Ed.2d 201 (1982). *Cf. Leather Masters*, 836 F.Supp. at 331 ("[W]ithout more, communications made from outside of the State to a Maryland resident are not enough to justify the exercise of personal jurisdiction over an out-of-state defendant.").

■ If I were required to resolve the issue, I would be inclined to find that it cannot fairly be said that Colonial "purposefully availed itself of the privilege of conducting activities within" Maryland and that the assertion of personal jurisdiction over it would therefore be unconstitutional. There is a narrower ground of decision available to me, however. The constitutional question is a close one upon which reasonable minds could differ. In my judgment, there is no reason to inject such a question into the case unnecessarily. It would not be in the interest of any of the parties or any of the witnesses to litigate this case in Maryland, only to have a ruling upholding the assertion of jurisdiction over Colonial reversed on appeal. Nor would that course further the general public interest in the sound and efficient administration of justice or effectuate the specific purposes of the Civil Justice Reform Act of 1990 to reduce the cost and delay of litigation. *See* 28 U.S.C. §§ 471 *et seq.*

Aside from Coleman's own representatives, the potential witnesses in this case reside in Pennsylvania. Furthermore, Maryland and Pennsylvania are contiguous to one another, and it is not unduly burdensome to require plaintiff to travel to Pennsylvania to try this case (if that ultimately proves necessary). Under these circumstances I find that Coleman's choice of forum must yield to other interests, and I will grant Colonial's motion to transfer the action to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).

A separate order effecting the ruling made in this memorandum is being entered herewith.

## ORDER

For the reasons stated in the memorandum entered herewith, it is this 8th day of June 1995

ORDERED

1. Defendant's motion to dismiss or to transfer is treated as one to transfer and, as such, is granted; and

2. This action is transferred to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).